Williams, Judge,
delivered the opinion of the court:
On January 17, 1926, the plaintiff filed its petition in this court, H-22, wherein it sought to recover from the United States the sum of $391,278.63, with interest, for repairing and reconditioning certain vessels owned by the United States Shipping Board. Later, in April 1928, a bill was introduced in the Senate of the United States appropriating the sum of $590,468.82 to the plaintiff as reimbursement for repairing and reconditioning the vessels, the relief to plaintiff proposed in the Senate bill being identical to the relief sought in H-22. This bill was, by Senate Eesolution No. 241, referred to this court, May 21, 1928. Upon motion of the plaintiff the two cases were consolidated by the court on July 21, 1928, and are being heard under the number, Congressional 17636.
In May 1920 the United States Shipping Board was the owner of certain German vessels which had been seized during the war, and converted into transports, and used as such, as well as certain other vessels that had, under authority of law, been constructed by and for the Shipping Board.
On May 28, 1920, the United States, acting through the Shipping Board, entered into a contract with the United States Mail Steamship Company, hereinafter referred to as 'the steamship company, wherein it was mutually agreed *65 that certain, of the aforesaid vessels, including those directly involved in suit, should be delivered by the Shipping Board to the steamship company, within a year, to be chartered for operation by that company, with an option reserved in the steamship company to purchase at the end of five years, upon terms substantially the same as a charter party annexed to the contract. The vessels were delivered to the United States Mail Steamship Company in accordance with, the terms of the contract, and a charter party was subsequently entered into covering each of the vessels so delivered, substantially identical to the form of charter party annexed to the contract.
The skeleton charter party attached to the agreement, provided that upon receipt of the vessels by the steamship company that company would promptly, and at its own cost and expense, repair the vessels in accordance with plans and specifications to be prepared by it and approved by the Shipping Board. The steamship company upon receipt of the vessels entered into contracts with the plaintiff to recondition the vessels. Plaintiff performed the work promptly and efficiently and to the entire satisfaction of both the steamship company and the Shipping Board. The Shipping Board, through its representatives, kept in close touch with the work as it progressed, saw that the work was performed in accordance with the plans and specifications, and kept a check as to the charges made for the work. A short time after plaintiff had completed the work of repairing the vessels, and they had been put into operation by the steamship company, that company defaulted on its obligations to the Government, and the vessels were taken back by the Shipping Board. There is due the plaintiff an unpaid balance of $331,879.25, which amount it seeks to recover in this suit.
The plaintiff can not recover because:
(1) The claim is based on a maritime cause of action growing out of the possession and operation of merchant vessels of the United States, which this court under the suits in admiralty act, 41 Stat. 525, is without jurisdiction to hear and determine;
*66 (2) The plaintiff is- estopped by reason of the judgment in Morse Dry Dock & Repair Co. v. United States, 1 Fed. (2nd) 233, from prosecuting its suit in this court, and
(3) The plaintiff had no agreement with the United -States, either express or implied, obligating the Government to pay the plaintiff for reconditioning and repairing the vessels.
The reasons assigned why plaintiff may not recover will he considered in the order of their statement.
1. An action for the recovery of the costs of labor and material furnished in repairing a vessel is maritime in its nature and falls within the admiralty jurisdiction, Perry v. Haines, 191 U.S. 17; New Bedford Dry Dock Co. v. Purdy, 258 U.S. 96. Under the provisions of the suits in admiralty act, 41 Stat. 525, jurisdiction in maritime causes of action •against the United States arising out of the possession or operation of merchant vessels for it, is vested exclusively in the district courts of the United States. Blamberg Bros. v. United States, 260 U.S. 452; Shewan & Sons v. United States, 266 U.S. 108; Fleet Corporation v. Rosenberg Bros., 276 U.S. 202; Johnson v. Fleet Corporation, 280 U.S. 320; Matson Navigation Co. v. United States, 284 U.S. 352.
Prior to the passage of the suits in admiralty act, mer-chant vessels of the United States were subject to seizure the same as private vessels, and the right of suit at common law could be maintained, including the remedy of attachment for payment of the judgment sought, against the owner -corporations in State or Federal courts on a cause of action arising out of the operation of such ships. Sloan Shipyards v. United States Fleet Corporation, 258 U.S. 549. Section 1 of this act forbids the arrest or seizure of vessels owned or operated by or for the United States. Section 2 provides that where a proceeding in admiralty could be maintained, if at the túne of the commencement of the action such vessel were privately owned or operated, “ a libel in personam maybe brought against the United States * * * provided that such vessel is employed as a merchant vessel * * •and that such suits shall be brought in the District Court of the United States * * The purpose of the act was to relieve the United States of the inconvenience resulting *67 from such seizures and give remedy by libel in personam against the United States and such corporations. Blamberg Bros. v. United States, supra.
The decisions are uniform that the suits in admiralty act provides the exclusive remedy against the United States and corporations operating merchant vessels belonging to it on all maritime causes of action arising out of the possession or operation of such vessels. In Johnson v. Fleet Corporation, supra, the court said:
“ The analysis of the act and the reasons on which rests our decision in Fleet Corporation v. Rosenberg Bros, apply here. Putting the United States and the Fleet Corporation on the same footing and providing remedies to be exclusive in admiralty would not serve substantially to establish uniformity if suits under the Tucker Act and in the Court of Claims be allowed against the United States and actions at law in State and Federal courts be permitted against the Fleet Corporation or other agents for enforcement of the maritime causes of action covered by the act. Such a failure of purpose on the part of the Congress is not readily to be inferred. We conclude that the remedies given by the act are exclusive in all cases where a libel might be filed under it.”
The plaintiff concedes in its brief that the suits in admiralty act provides exclusive remedy against the United States for maritime causes of action arising out of the possession or operation of merchant vessels, and precludes suits against the United States under the Tucker Act, and actions at law in State or Federal courts against the Fleet Corporation or other agents for the enforcement of such causes of action. Although the plaintiff, in its several libels in personam against the United States tried in the consolidated case of Morse Dry Dock & Repair Co. v. United States, 1 Fed. (2d) 233, in the Southern District of New York, urged that the vessels involved were merchant vessels, it here contends that such vessels were not merchant vessels but were public vessels.
It is urged that since the vessels had, prior to the time they were turned back to the Shipping Board after the close of the war, been operated exclusively by the Army as transports, they were public vessels, and that they remained *68 public vessels until after the plaintiff had completed the work of repairing them; that until the work of repairing the vessels had been completed they were not merchant vessels within the meaning of the suits in admiralty act. The Augusta G. Hilton, 3 Fed. (2d) 808, supports the plaintiff’s contention, but we are of the opinion the weight of authority, though meager, justifies a holding that the vessels involved were merchant vessels within the meaning of the suits in admiralty act at the time the repairs upon them were made by plaintiff.
In Eastern Transportation Company v. United States, 212 U. S. 675, the court said:
“ What the statute means by saying ‘ employed as a merchant vessel,’ is that the vessel shall belong to that class as distinguished from one employed in the governmental service — :not necessarily that it shall be actively thus employed at the time of the collision.”
In Shewan & Sons v. United States, supra, the court said:
“ What, then, does the proviso mean ? Are the words to be construed as if they read 4 is being actively employed as a merchant vessel ’ ? Such a construction is a narrow one and not in accord with the equitable purpose of Congress. The important line between immunity from judicial seizure of Government vessels under the act of 1916 was between public vessels and those engaged in merchant service. The mere laying up of a vessel engaged in the latter service would not change its character, unless the Government did something affirmative to make it a public vessel.”
The vessels were all withdrawn from the public service by the Shipping Board prior to the time they were repaired by the plaintiff. The Shipping Board had agreed to enter’ into charter agreements with the steamship company for the use and operation of the vessels in the merchant service. They had been turned over to the steamship company by the Shipping Board under this agreement and had been delivered to the plaintiff by the steamship company for necessary alterations and repairs. We think they ceased to be public vessels when they were withdrawn from the transport service by the Shipping Board and were no longer employed in the governmental service. They acquired the *69 character of merchant vessels by the affirmative acts of the Government in withdrawing them from the public service, and chartering and delivering them to the steamship company t0 be operated as merchant vessels. We think these aíTr-the character of affirmative acts which the Supreme Court in Shewan & Sons v. United States, supra, indicated would change the classification of a vessel from one service to another. This view is supported in Adams et ail. v. United States, 281 Fed. 895, where a libel was filed against the United States as owner of the steamship Lansing, under the suits in admiralty act of March 9, 1920, growing out of a collision in which the Lansing had fouled another vessel. Up until two days before the collision the Lansing had been in the service of the Navy Department, employed in other than merchant service. Two days before the collision the Navy Department had formally turned the vessel back to the Shipping Board. The survey made in connection with turning the vessel back to the Shipping Board had shown that about $3,400 worth of work was needed to be done, and the steamer, under orders from the Shipping Board, was awaiting her turn at the yard for that purpose. After the repairs were made the vessel was put into service as a freighter on the Munson Line. The defense was made that the Lansing was not employed in the merchant service at the time of the accident. The court, in passing upon that issue, said:
“ The expression ‘ employed as a merchant vessel ’ has reference to the work which the vessel is doing, or for which she is proceeding, or waiting. A vessel is employed as a merchant vessel, not merely when transporting cargo, but when going light to load, when awaiting repairs, etc. * * * Here the Lake Lansing had been discharged from nonmer-chant service; she was under Shipping Board orders, and was awaiting repairs in order to fit her for carrying freight or passengers. This, it seems to me, was employment in merchant service within the meaning of this statute.”
We hold that the vessels involved were merchant vessels within the meaning of the suits in admiralty act.
2. One of the oldest rules of the law is that matters once determined in a court of competent jurisdiction may never *70 again be called in.question bj^ parties or their privies against objection, though the judgment may have been erroneous and liable to, and certain of, reversal in a higher court. Bigelow on Estoppel 3d ed., Outline, pp. lxi, 29, 57, 103. The estoppel extends to every material allegation or statement which, having been made on the one side and denied on the other, was at issue in the cause, and was determined therein. Aurora v. West, 7 Wall. 102.
The rule is well stated in Goodenow v. Lichfield, 59 Iowa 226:
“ If the right to recover and the defense thereto are based upon precisely the same ground, why litigate again the question that has been determined ? In such case the very right of the matter has been determined by a court of competent jurisdiction. It is not essential that the causes of action should be the same, but it is essential that the right or title should be; that is, the issues in both actions and the matter on which the estoppel depends must be the same, or substantially so. The very matter or thing which it is sought to litigate must have been adjudicated in the prior action. In such case the bar or estoppel is complete. This rule, we think, will not be disputed.” (Cited with approval in New Orleans v. Citizens' Bank, 167 U.S. 371, 401.)
The plaintiff’s right to recover from the United States the amount of its unpaid claims for repairing the vessels involved was litigated and determined in the United States District Court of the Southern District of New York in Morse Dry Dock & Repair Co. v. United States, 1 Fed. (2d) 233. That proceeding was a consolidated case of various libels in personam which had been filed against the United States to enforce payment of the identical claims upon which recovery is sought in this case — the libelant therein being the plaintiff here. The respective libels stated in substantially the same language, though differently paragraphed, that (1) the vessels were merchant vessels, (2) that the labor and supplies and other necessaries furnished by the libelant would have been subject to a maritime lien if the vessels had been privately owned, and that a proceeding in admiralty could have been maintained therefor, (3) that the labor performed and the materials furnished had been at the instance and request of the United States, and of the *71 person to whom lawful possession and. management of each of the vessels had been entrusted by the United States, and,. (4) that the “libelant was entitled to and did proceed against the United States in personam for the recovery of said amount.” The case was tried upon the merits and the* libels against the United States as to each of the vessels were-dismissed. While there were no special findings of fact in the district court it is clear from the opinion of the court and the entire proceedings that the facts relied upon by the plaintiff, and litigated and determined in that court are-precisely the same as those alleged and relied upon for-recovery here., The proceedings in the district court were not in rem to establish a lien on the vessels but were proceedings in personam under section 2 of the suits in admiralty-act to procure a judgment against the United States for the value of material and services furnished in repairing the. vessels. Eecovery in the in personam action was dependent entirely upon a showing that if the vessels had been privately owned liens would have attached to the vessels themselves for the cost of the labor and material furnished in repairing, them.
Section 1 of the act of June 23, 1910, provides:
“ that any person furnishing repairs * * * to a vessel,, whether foreign or domestic, upon the order of the owner or owners of such vessel, or of a person by him or them authorized, shall have a maritime lien on the vessel which may be enforced by a proceeding in rem. * * * ”
Section 3 of the act provides:
“ nothing in this act shall be construed to- confer a lien when the furnisher knew, or by the exercise of reasonable diligence could have ascertained, that because of the terms of the contract of a charter party, agreement for sale of the vessel, or for any other reason, the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefor.” (The act of June 5, 1920,, carries the same proviso.)
In deciding the case, the circuit court of appeals, as shown by the opinion rendered (Morse Dry Dock & Repair Co.,, supra, 1 Fed. (2d) 233), decided and determined (1) that the United States did not order the work of repairing the- *72 vessels to be done by the plaintiff, (2) that the plaintiff contracted with the steamship company to do the work, and ■understood that it would pay the bills, and (3) that the plaintiff, by the exercise of reasonable diligence, could have ascertained the fact that the steamship company was without authority to bind the vessels. The court said:
“We have not overlooked the fact that Morse states that officials of the steamship company had stated that it had bought the vessels, and that the Government had ■agreed to pay for putting the ships in condition to operate. But he never asked to see the contract between the steamship company and the United States, and he never addressed any inquiry to the Shipping Board upon the subject. He trusted to the representations made to him, although he knew that the contracts for the reconditioning the ships were made with the steamship company, and that that com' pany was to pay the bills.”
There can be no question but that every material fact or thing asserted by plaintiff in the present suit, and upon which it relies for recovery, was asserted, litigated, and determined adversely to the contentions of the plaintiff in the district court. The plaintiff is estopped by the judgment in that court from relitigating the same questions and matters in this court. It is entirely immaterial whether the claim or demand in the two suits are identical, the estoppel results from the thing actually adjudged — the matters definitely litigated and determined. In New Orleans v. Citizens Bank, supra, p. 396, the court said:
“ The estoppel resulting from the thing adjudged does not depend upon whether there is the same demand in both cases, but exists, even although there be different demands, when the question upon which the recovery of the second demand depends has under identical circumstances and conditions been previously concluded by a judgment between the parties or their privies. This is the elemental rule, stated in the text books, and enforced by many decisions of this court.”
3. The jurisdiction of the court so far as material here is found in section 145 of the Judicial Code (title 28, sec. 250 U.S.C.), and is limited to “claims founded upon any contract, express or implied, with the Government of the United *73 States * * * in respect of which claims the party would be entitled to redress against the United States either in court of law, equity, or admiralty if the United States were suable.” Since it is not contended that the plaintiff had an express contract with the Shipping Board obligating the United States to pay the cost of repairing the vessels, its right to recover must depend entirely upon an implied agreement to that effect. An implied contract in order to give the court jurisdiction to award judgment against the United States must be one implied in fact, and not one based merely on equitable considerations and implied in law. United States v. Minnesota, 271 U.S. 212.
A contract implied in fact arises where the intention of the parties is not expressed, but an agreement in fact, creating an obligation is implied or presumed from their acts. There is no essential difference between an express agreement and an agreement implied in fact, the only distinction between them being the method of proof in establishing them. In each there must be a meeting of the minds of the parties. Knapp v. United States, 46 C.Cls. 601; Coleman v. United States, 152 U.S. 96; Bigby v. United States, 188 U.S. 400. In Bigby v. United States, supra, the court said:
“ There was no point in the whole transaction, from its commencement to its close, where the minds of the parties met, or where there was anything in the semblance of an agreement.”
In Coleman v. United States, supra, the court said:
“ But we think that a promise to pay for services can only be implied when the court can see that they were rendered in such circumstances as authorized the party performing to ■entertain a reasonable expectation of the payment by the party benefited.
“ It is a conceded fact in the present case * * * that the claimants did not expect, during the period in which the services were performed, that the United States would compensate them; that they looked for recompense to the clients who had retained them * * *.”
Applying the rule announced to the facts in the instant case it cannot be said that an agreement, implied in fact, ever existed between the plaintiff and the Shipping Board, .obligating the United States to pay the cost of repairing the *74 vessels. There is no fact in the record justifying a finding-that the minds of the parties ever met, or that the plaintiff' at any time during the progress of the work expected the-United States to recompense it for the repair of the vessels. In fact the testimony of plaintiff’s president, Mr: Morse,, affirmatively establishes the fact that plaintiff at no time,either when it contracted with the steamship company to repair the vessels, or during the performance of the work of. repairing them, understood that the Shipping Board was to-pay for the work, but on the contrary plaintiff understood-that its bills would be paid by the steamship company, and'! looked to that company for payment.
Mr. Morse testified:
“ Q. As I understand it, Captain Koester told you that" the United States Mail was to pay your bills ?
“A. Yes.
“ Q. You didn’t understand from Captain Koester that"the - Shipping Board was going to have anything to do with yoro except to check up your bills?
“A. Eight.
“ Q,. They weren’t to pay you?
“A. No; the United States Mail was to pay our bills.
“ Q. You didn’t understand that you had any claim against. the Shipping Board at that time, did you ?
UA. Only — we have against the ship always.
“ Q. You claim you have a lien?
“A. Yes; a lien on the ship.
“ Q. But I am not speaking whether that is true as a'legaL proposition. I am trying to get your views at that time, the - way you felt at that time, as to whether you had a claim against the Shipping Board ?
“A. I don’t know that I thought about that at all. E simply believed that the United States Mail had purchased, the ships and that the United States Mail was paying.1 my bill. They owned the ships, so naturally I worked accordingly.
“ Q. Ajad they told you that the Shipping Board' was going: to reimburse them for this expense?
“A. For reconditioning; yes.
* Sfc ❖ & *
“ Q,. Did all these boats belong to the United States?'
“A. They did originally; yes.
“ Q,. Did you believe from the statement made-to--you by Captain Koester and the fact that the Government checked! *75 these repairs and from the meeting of the Shipping Board at Washington, at which you were present, that the Mail Company had bought these boats ?
“A. I did; yes.
“ Q. When did you first discover that the Mail Company had not bought these boats, and did not own them?
“A. August 1921.”
This testimony utterly refutes the contention now made by plaintiff that it understood, while the work of repairing the vessels was being performed, that the Government owned the vessels, or would pay for their repair. The only reasonable conclusion that can be reached from Mr. Morsel testimony, and the facts and circumstances under which the work of repairing the vessels was performed is that plaintiff believed that the steamship company owned the vessels and was liable for the cost of repairing them, and that, because of the steamship company’s ownership of the vessels, they themselves could be held liable. Since the plaintiff never expected the Shipping Board to pay for the repair of the vessels at the time the work was being done but looked to another for the payment of its bill, the minds of the parties never met, Bigby v. United States, supra, and there exists no express or implied obligation upon the part of the defendant to compensate the plaintiff for the work of repairing the vessels. Having failed to show that it had either an express or an implied agreement obligating the-United States to pay the cost of repairing the vessels in question, plaintiff has established no legal or equitable claim upon which it can recover.
The plaintiff makes the contention that the United States is morally obligated to recompense plaintiff for the work performed and materials furnished in reconditioning the vessels. This court, of course, is without jurisdiction to adjudicate the moral obligations of the Government, that authority being exclusively in the Congress. It is not questioned that the plaintiff furnished the labor and material required in repairing and reconditioning the Shipping Board vessels involved, and that the work was efficiently performed by it, and that there is now due and unpaid to the plaintiff on account of such labor and materials the sum *76 of $331,879.25. That the Government received the direct benefits arising from the repairing and reconditioning of the vessels is manifest, as they were taken back by the Shipping Board within a few months after the work was performed. The record of the case also reveals the fact that during the time work upon the vessels was being performed by the plaintiff, Shipping Board officials were aware of the weak financial condition of the steamship company and anticipated that it would probably not be able to meet its obligations to the Government under the charter agreement. Whether these facts create a moral obligation on the part of the Government to pay the plaintiff the balance due on its bills for the work is a matter that can only be determined by Congress. The petition is dismissed and the findings of fact herein, the opinion, and proceedings required by section 151 of the Judicial Code will be transmitted to the Senate of the United States. It is so ordered.
Wi-ialey, Judge; Litti/etoN, Judge; and GkeeN, Judge, concur.
Booth, Ohief Justice, took no part in the decision of this case on account of illness.